E-FILED on  4/4/2011

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NEIL B. GOLDBERG,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JAMES CAMERON, GALE ANN HURD, et al.<br><br>　　　　Defendants. | No. C-05-03534 RMW<br><br>ORDER GRANTING DEFENDANTS GALE ANNE HURD AND PACIFIC WESTERN PRODUCTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT<br><br>**[Re Docket No. 175]** |

　　Defendants Gale Ann Hurd ("Hurd") and Pacific Western Productions, Inc. ("Pacific Western")[1] move for summary judgment with respect to plaintiff Neil B. Goldberg's ("Goldberg") sole claim for contributory copyright infringement as set forth in his third amended complaint. For the reasons stated below, the court grants defendants' motion.

## I. BACKGROUND

　　Goldberg contends that a script and soundtrack he sent to New World Pictures in or around 1979 were misappropriated by Hurd and incorporated into the popular action films "The

---

[1] Pacific Western is referred to as Hurd's "loan out" company which Goldberg claims is Hurd's alter ego. For simplicity's sake, the court refers to Hurd as collectively referring to Hurd and Pacific Western.

1  Terminator" ("T-1") and "Terminator 2: Judgment Day" ("T-2").  Since then, two more allegedly
2  infringing additions to the franchise have been released: "Terminator 3: Rise of the Machines" ("T-
3  3") and "Terminator 4: Salvation" ("T-4").  There has also been a spin-off television program
4  entitled "The Sarah Connor Chronicles."  The court refers collectively to these works as the
5  "Terminator Franchise."  Broadly speaking, the Terminator films and television show track the lives
6  of Sarah Connor and her son John Connor in their (so far unsuccessful) efforts to avert a robot-
7  controlled totalitarian future.  Those efforts include fending off increasingly sophisticated robot
8  assassins sent back in time to stop the Connors from thwarting the robots' eventual rise to self-
9  awareness and world domination.

10  In the mid-1970s, Goldberg began composing songs for an album he called *Energy*.
11  Declaration of Neil Goldberg in Opposition to Motion for Summary Judgment ¶4 ("Goldberg
12  Decl.").  The album included tracks containing "industrial and spacey melodies and sounds." *Id.* at ¶
13  21.  Thinking that the music could be a movie soundtrack, Goldberg also wrote an eight-page script
14  outline, entitled *Long Live Music*, describing an epic battle in the future between humans and
15  computers, and directing that particular tracks from *Energy* accompany certain scenes.  Goldberg's
16  story is about a world where music and the arts have disappeared, and the world's computers have
17  gone bad and built robot armies to destroy mankind.  In the story, a good professor builds a peaceful
18  computer named Ludwig, who teaches humans that the world can be saved through the power of
19  music.  The humans search the planet for the few surviving musicians, and together with god-like
20  heroes from outer space, they use the power of music and dance to defeat the bad computers and
21  restore love, happiness, music, and dance to the world.

22  Goldberg contends that the films of the Terminator Franchise infringe on his copyright in
23  *Energy* and *Long Live Music*.  He registered his "dramatic work and music" with the United States
24  Copyright Office and was issued a certificate of registration, No. Pau 175-490, on November 4,
25  1979.  Goldberg testified that he sent a promotional package including the script and music to,
26  among others, New World Pictures, where Hurd allegedly worked, around 1979.  Goldberg Decl. ¶
27  6.  According to Goldberg, the Terminator films include plot elements and a soundtrack that are
28  similar to his script and his soundtrack.

ORDER GRANTING DEFENDANTS GALE ANNE HURD AND PACIFIC WESTERN PRODUCTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT —No. C-05-03534 RMW
MEC                                              2

Defendant Hurd produced T-1 and T-2.  Decl. of Gale Anne Hurd ¶¶ 8, 11.  Hurd declares that she has never received, reviewed or even seen Goldberg's works. *Id.* at 3-7.  Goldberg has not established that Hurd worked at New World Pictures in 1979, but Hurd has not denied that she did.

Goldberg filed the instant lawsuit on August 31, 2005.  On January 19, 2007, defendants moved to dismiss, arguing that the three-year statute of limitations had run.  The court granted the motion to dismiss as to all copyright claims accruing before August 31, 2002.  For infringement after that date, the court denied the motion to dismiss.  Defendants then moved on November 4, 2008 for summary judgment on all claims in the second amended complaint as barred by the statute of limitations.  The court granted defendants' motion for summary judgment with respect to the claims for direct copyright infringement, but the court permitted Goldberg to amend his complaint to pursue a claim for contributory copyright infringement arising out of Hurd's 1998 assignment of rights to the Terminator Franchise and the subsequent production of T-3, T-4, and the Terminator television series.

## II. ANALYSIS

Defendants now seek summary judgment on Goldberg's sole remaining claim for contributory copyright infringement, which stems from Hurd's 1998 assignment of the rights to develop future installments of the Terminator Franchise and the alleged subsequent direct infringement of Goldberg's creations by T-3, T-4, and the Terminator television series.  Defendants argue that Goldberg cannot establish the required elements of knowledge or inducement necessary to support a claim for contributory copyright infringement.  They further argue that no reasonable jury could find substantial similarity between Goldberg's story and soundtrack and the story and music of the Terminator Franchise, and that Goldberg therefore cannot establish that he has a valid underlying direct copyright infringement claim.  In addition, defendants urge that Goldberg cannot establish that defendants had access to his creations, and that Goldberg is therefore subject to more stringent requirements to demonstrate similarities between Goldberg's works and the works that comprise the Terminator Franchise.

**A.      Summary Judgment**

Summary judgment is proper when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(f). Material facts are those which may affect the outcome of the case. *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* If the moving party meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact, the burden of production shifts and the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

### 1. Contributory Copyright Infringement

Contributory copyright infringement is a form of secondary liability with roots in concepts of enterprise liability and imputed intent. *Perfect 10, Inc. v. Visa Intern. Services Ass'n*, 494 F.3d 788, 794-5 (9th Cir. 2007). In the Ninth Circuit, one contributorily infringes when he (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement. *Id.* This case presents unique circumstances: the situation where the alleged material contribution or inducement of infringement occurred years before the allegedly infringing works were created or released. Defendants contend that there is no evidence that Hurd had knowledge of the copyright infringement alleged with respect to T-3, T-4, and the Terminator television series at the time she made the 1998 assignment of her rights to develop future installments of the Terminator Franchise, and thus cannot be liable for contributory copyright infringement. In other words, defendants argue that Hurd could not have known that future films, television programs, and music would be infringing when those projects had not even been undertaken, let alone released.

Goldberg points to the fact that Hurd was paid $9 million for the assignment of her rights, and to references in the agreement to "proposed Additional Pictures." He argues that Hurd could have assumed that there would be additional infringing activities. Goldberg's argument assumes that Hurd knew that she was assigning rights to material subject to Goldberg's copyright. The only evidence that Goldberg sent his script and musical to New World Pictures is his oral testimony that

he did so in 1979. The mail receipts he attached to his declaration do not appear to show mailing to New World Pictures. *See* Goldberg Decl. Ex. 3. Goldberg did not send the materials to Hurd but assumes Hurd must have seen them. Hurd was a producer of T-1 in 1984, several years after Goldberg allegedly sent his material to New World Pictures, and an executive producer ot T-2. Hurd Decl. at ¶¶ 8 and 11. Goldberg's contributory infringement argument thus depends on this slim evidence of access and what he claims is the "striking similarity" of T-3, T-4 and the Terminator televison series.[2]

### 2. Underlying Direct Copyright Infringement

Even if Goldberg's evidence satisfies the knowledge and inducement or contribution requirements of contributory copyright infringement, his claim cannot exist in the absence of direct infringement by a third party published within the three years before he filed his lawsuit. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001). To show direct infringement, Goldberg "must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Benay v. Warner Bros Entertainment,* Inc., 607 F.3d 620, 624 (9th Cir. 2010) (quoting *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). Defendants do not deny that Goldberg owns a valid copyright, but they deny that T-3, T-4, or the Terminator television series copied Goldberg's creations. "Absent evidence of direct copying, proof of infringement involves fact-based showings that the defendant had access to the plaintiff's work and that the two works are substantially similar." *Id.* (quotation omitted).

"'When the issue is whether two works are substantially similar, summary judgment is appropriate if no reasonable juror could find substantial similarity of ideas and expression.'" *Id.* (quoting *Kouf*, 16 F.3d at 1045). "Substantial similarity is a fact based inquiry, but it may often be decided as a matter of law." *Id.* (quotation omitted).

"'The Ninth Circuit employs a two-part test for determining whether one work is substantially similar to another.'" *Id.* (quoting *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir.

---

[2] Goldberg's papers refer to verbatim inclusions from his copyrighted work in the Terminator Franchise. There is, however, no evidence of any verbatim language or identical music.

1990). To prevail on his infringement case, Goldberg must prove "'both substantial similarity . . . under the "extrinsic test" and substantial similarity under the "intrinsic test."'" *Id.* (quoting *Shaw*, 919 F.3d at 1356). "'The "extrinsic test" is an objective comparison of specific expressive elements.'" *Id.* (quoting *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002)). "'The "intrinsic test" is a subjective comparison that focuses on whether the ordinary, reasonable audience would find the works substantially similar in the total concept and feel of the works.'" *Id.* (quoting *Cavalier*, 297 F.3d at 822). "On a motion for summary judgment, we apply only the extrinsic test. The intrinsic test is left to the trier of fact." *Id.* If Goldberg fails to satisfy the extrinsic test, he cannot survive a motion for summary judgment. *See Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1448-49 (9th Cir. 1988).

### a. Literary Analysis

The extrinsic test, as applied to determine copyright infringement in a literary case, is explained in *Benay*:

> The "extrinsic test" is an objective comparison of specific expressive elements  The "intrinsic test" is a subjective comparison that focuses on whether the ordinary, reasonable audience would find the works substantially similar in the total concept and feel of the works.  On a motion for summary judgment, we apply only the extrinsic test. The intrinsic test is left to the trier of fact.  If the Benays fail to satisfy the extrinsic test, they cannot survive a motion for summary judgment.
>
> The extrinsic test is an objective test based on specific expressive elements: the test focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works.  A court must take care to inquire only whether the protectable elements, standing alone, as substantially similar. Copyright law only protects expression of ideas, not the ideas themselves. *Scenes-a-faire*, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement. Familiar stock scenes and themes that are staples of literature are not protected.  Historical facts are also unprotected by copyright law.
>
> Under the "inverse ratio" rule, if a defendant had access to a copyrighted work, the plaintiff may show infringement based on a lesser degree of similarity between the copyrighted work and the allegedly infringing work.  For purposes of the Benays' copyright claim, we assume without deciding that the inverse ratio rule applies to lower the burden on the Benays to show similarity. Even if the Defendants had access to the Screenplay, the Benays have not shown sufficient similarity between the Screenplay and the Film to maintain an infringement claim under federal copyright law.
>
> The Benays point to a number of similarities between the Screenplay and the Film. Both have identical titles; both share the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the

>methods of modern Western warfare for its fight against a samurai uprising; both have protagonists who are authors of non-fiction studies on war and who have flashbacks to battles in America; both include meetings with the Emperor and numerous battle scenes; both are reverential toward Japanese culture; and both feature the leader of the samurai rebellion as an important foil to the protagonist. Finally, in both works the American protagonist is spiritually transformed by his experience in Japan.
>
>We agree with the district court that "[w]hile on cursory review, these similarities may appear substantial, a closer examination of the protectable elements, including plot, themes, dialogue, mood, setting, pace, characters, and sequence of events, exposes many more differences than similarities between Plaintiffs' Screenplay and Defendants' film." The most important similarities involve unprotectable elements. They are shared historical facts, familiar stock scenes, and characteristics that flow naturally from the works' shared basic plot premise. Stripped of these unprotected elements, the works are not sufficiently similar to satisfy the extrinsic test.

607 F.3d at 624-25 (internal citations omitted).

Goldberg points to a number of similarities between LLM and the T-3, T-4, and the Terminator television series. Both works are set in the future, and in both works, advanced, self-aware computer networks seek to destroy humanity, who must fight mass-produced, death-ray-shooting robot armies to survive. In both works, some of the robots or computers are underground, and in both works, it seems that the computers cannot be turned off. Both works end somewhat ambiguously, apparently allowing for sequels.

Nonetheless, a closer examination of the protectable elements, including character, plot, sequence, theme, setting, mood, pace, and dialogue, demonstrates that there are many more differences than similarities between Goldberg's creation and the films and television series created from Hurd's assignment of sequel and remake rights in 1999. The most important similarity between the works involves an unprotectable element: the general idea of a futuristic conflict between man and machines, specifically computers and robots. That theme is a commonplace in science fiction. Indeed, the notion of intelligent machines evolving into conscious beings at war with human beings was originally developed in Mary Shelley's classic Frankenstein (1818). Other portrayals of artificial intelligence at war with humans include Stanley Kubrick and Arthur C. Clarke's 2001:A Space Odyssey (1968), the move Colossus: The Forbin Project (1970), and Philip K. Dick's story "Second Variety" (1952), a post-nuclear apocalypse story in which the defeated

1  forces turn to a guerrilla warfare conducted by self-reproducing machines programmed to destroy
2  anything that lives.
3      Goldberg's story has no Terminator character, no time travel, and no cyborgs sent back from
4  the future to alter events in the past.  The Terminator Franchise, in turn, does not feature music as a
5  weapon which defeats bad computers or restores happiness, love, music and dance to the world, and
6  none of the Terminator films or the television series include god-like characters who travel from
7  outer space to use music and dance to save mankind.  Though the works shares a common premise
8  and elements that follow naturally from that premise, the Terminator Franchise and LLM tell
9  fundamentally different stories.

10                 **b.  Musical Analysis**

11      There is no evidence that Hurd had anything to do with the creation of the music, the score or
12  the musical theme in T-1.  She is not a musician or musical composer.  Hurd Decl. at ¶¶ 9 and 10.
13  According to Hurd, the musical theme for T-1 was composed by Brad Fiedel, and she had nothing to
14  do with the creative process for the music in T-1.  There is no evidence in the record that any
15  musical materials relating to T-3, T-4, or the Terminator Television show were passed along by
16  Hurd to the creators of the future Terminator works at the time of the assignment.
17      The extrinsic and intrinsic tests are also used in comparing an allegedly infringing
18  composition with the copyrighted composition.  *See Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir.
19  2004).  In *Swirsky v. Carey*, the Court of Appeals explained that in the context of comparing musical
20  works, "[t]he extrinsic test requires 'analytical dissection of a work and expert testimony.'" *Id.*
21  (quoting *Three Boys*, 212 F.3d at 485).  In analyzing musical compositions under the extrinsic test,
22  there is no uniform set of factors to be used; music is composed of a large array of elements,
23  including idea, lyrics, rhythm, pitch, tempo, melody, harmony, structure, chord progressions,
24  dissonance, and new technological sounds, and some combination of those elements is protectable
25  by copyright.  *Id.* at 849.  To avoid summary judgment, the non-moving party must provide "'indicia
26  of a sufficient disagreement concerning the substantial similarity of [the] two works.'" *Id.* at 848
27  (quoting *Brown Bag*, 960 F.2d at 1472).  "So long as the plaintiff can demonstrate, through expert
28  testimony that addresses some or all of these elements and supports its employment of them, that the

ORDER GRANTING DEFENDANTS GALE ANNE HURD AND PACIFIC WESTERN PRODUCTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT —No. C-05-03534 RMW
MEC                            8

United States District Court
For the Northern District of California

similarity was 'substantial' and to 'protected elements' of the copyrighted work, the extrinsic test is satisfied." *Id.* at 849.

Defendants' expert has explained and analyzed the components of the musical works, including their structure or form, harmony, rhythm, melody, and lyrics, and he reports that in their entirety, there are no remotely relevant similarities between Goldberg and defendants' musical compositions. He further reports that there are no relevant similarities in any of the elements of the compositions.

Goldberg's memorandum of points and authorities is essentially void of any discussion of the musical compositions. Goldberg's expert reports, however, are attached to his opposition. Defendants argue that the Sonnenschein Report should not be considered because it is not a rebuttal report to defendants' expert but an untimely new report regarding purported musical similarities between Energy and T-3, T-4, and the Terminator television series. The court agrees. Because Goldberg failed to comply with the Federal Rules of Civil Procedure and the court's scheduling order, the Sonnenschein Report will not be considered.

The expert report submitted by Randolph Masters in support of Goldberg's opposition–but never cited in the opposition–points to the similar "spacey sound" and to the effects the works of music have on the listener. Masters also points, without explanation, to similar "rhythmic booms," "metallic background accents," "distinctive blending of chaotic sound," and similar timber in certain musical segments. The court finds that these interpretations fail to provide any musicological support for Goldberg's claim of copyright infringement.[3] While the Ninth Circuit has recognized that "[m]usic is an art form that produces sounds and expresses moods," and that the extrinsic test provides an awkward framework to apply to works of music because they lack distinct elements of idea and expression, "the test is our law and we must apply it." *Id.* at 848. Goldberg has not provided a proper musicological comparison of the protectable elements of the musical works, and elements such as the mood of a musical composition are not protectable. The identified similarities

---

[3] The specific excerpts discussed by Goldberg's expert use music from T-1. Claims based on T-1 are, as this court has previously found, barred the statute of limitations. Among the many problems with Goldberg's musicological analysis is that it does not compare the only works of music that remain in this case–music from T-3, T-4, or the Terminator Television Show.

ORDER GRANTING DEFENDANTS GALE ANNE HURD AND PACIFIC WESTERN PRODUCTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT —No. C-05-03534 RMW
MEC          9

amount to musical ideas, such as tremolo effects, or to the mood, effect, and feeling of the compositions. At best, Goldberg and Masters have provided conclusions that compare T-1's music with Goldberg's music. They, however, do not provide an audio or visual comparison or analysis of the works at issue.

### c. Access

"Under the 'inverse ratio' rule, if a defendant had access to a copyrighted work, the plaintiff may show infringement based on a lesser degree of similarity between the copyrighted work and the allegedly infringing work." *Benay*, 607 F.3d at 625 (quoting *Shaw*, 919 F.2d at 1361). While Goldberg's claim that he mailed LLM and the Energy album to New World is based solely on his recollection and not on documents, considering the evidence in the light most favorable to Goldberg, we must conclude that defendants had access to Goldberg's creations. However, even under the lesser "substantial similarity" test, Goldberg has not shown sufficient similarity between LLM and Energy on the one hand and the Terminator Franchise on the other to maintain an infringement claim under federal copyright law.

## III. ORDER

For the reasons stated above, defendants' motion for summary judgment is granted.

DATED:   4/4/2011

RONALD M. WHYTE
United States District Judge